Appeal brought by the State of Illinois under Supreme Court Rule 604-A, raising a very narrow issue. The defendant, Kara Ringland, was stopped as she was driving her vehicle on Interstate 80 by State's Attorney's Investigator, Jeff Gaither, in January of 2012. She was charged with a narcotics offense and she filed a motion to quash the arrest and suppress evidence contending in Teralia that Jeff Gaither did not have the authority to execute a police stop that night. The cause went to a rather lengthy hearing, at the conclusion of which the trial judge made several rulings, including that the statute authorizing the appointment of Jeff Gaither as a State's Attorney's Special Investigator required strict compliance and that one portion of that statute had not been complied with. Specifically, before a person could be appointed as a Special Investigator under the State's Attorney's Statute, he had to have his fingerprints submitted to the State Police prior to the time he was sworn in so the State Police could generate a report, check their records, generate a report, and assure that there had been no felony convictions or convictions of illiteracy. All of the other portions of the statute had been complied with. That was the trial judge's finding. However, he found that that required strict compliance, not substantial compliance. Jeff Gaither had six months prior to this appointment as a State's Attorney's Special Investigator retired from the State Police having been an active trooper for over 20 years. He had had his fingerprints taken at the time he started his training with the State Police Academy in 1987 and had been continuously employed by them until July of 2011. Therefore, the State's Attorney, as he testified, since he was aware of his prior record, he felt that that would be duplicative to resend these fingerprints to the State Police and that that portion had not been complied with. The people contend on appeal that only substantial compliance is required, that the trial judge erred in finding strict compliance, that there was substantial compliance in this case because the statute is directory and not mandatory and because all of the purpose of the statute had been affected. He had been continuously employed with the State Police. He clearly had not had any felony convictions or convictions of moral turpitude in that time. His fingerprints remained on file with the State Police and the people have contended in their appeal that the trial judge erred in finding strict compliance was required, should have found that substantial compliance was all that was required, and would ask this court to overturn the order suppressing evidence and remand the cause for further proceedings. Let me ask you, you'd agree that if we were to conclude that the judge got the right result for the wrong reason, we would still affirm, right? It depends on what the reason was, but yes, I understand this court would do it. Well, taking that as, where in this enabling statute, I mean, in essence the state's attorney here in LaSalle County set up his own police department, didn't he? Yes. Do you think that's what was envisioned by the General Assembly in this enabling statute? I don't know what was envisioned by the General Assembly in this enabling statute. Well, good point, but do you think the language of the statute envisions that? I think the language of the statute is broad enough to encompass that, yes. To assist the state's attorney in the performance of his duties. Well, you know, at one point, I think, didn't the officer who was a former trooper, didn't he say he was going to go back and write a warning ticket? Yes, he did say that. Now, do you think this statute meant that the state's attorney's investigators were going to sit out here on I-80 and write warning tickets to speeders? Again, I don't know what the legislature envisioned. I know the statute that was passed. What's writing warning tickets to speeders got to do with, you know, serve subpoenas, make return of process, and conduct investigations which assist the state's attorney in the performance of his duties? I believe the state's attorney's testimony in this case was that he felt that the enforcement of narcotics laws was part of the performance of his duties, and that that's what he envisioned, that these special investigators were doing. If the state's attorney's duties involved going out in the interstate and writing warning tickets, don't you think the General Assembly would give him a gun and a badge and a police car to go out there and do that stuff? No, the statute is narrowly drawn so that somebody has to have prior law enforcement experience in this case, and it would be the state's attorney's investigator and not a state's attorney who would be out on the interstate. And generally, you know, one thing the state's attorney does when the police arrest somebody, he's supposed to look and say, yeah, this is a case we're going to prosecute or isn't. So there's some distance between the police and the state's attorneys. A lot of times, a lot of tension between the police and the state's attorney because, gee, when the state's attorney chooses not to prosecute, some arrests that the Congress brought in. Has that changed when, in essence, the police are the state's attorney's employees? In this case, there was a special prosecutor, and Mr. Towne was not prosecuting this case. This case was prosecuted by a special prosecutor, so there was some distance. How many of these are in the pipeline now? Excuse me? How many? How many of these kinds of cases are in the pipeline now? There are four pending before this court that were consolidated and argued back in December. That would be Pirro? That's Pirro. And the three cases consolidated with that and this case. And those are the only ones that I'm aware of that are in the pipeline. Nothing else is riding around. I said nothing else is riding around that you're aware of. Not that I'm aware of. Mr. Comey mentioned, I don't know if that's the same type of issue you're talking about with the Henry County case or no? No, Henry County is the only one that's state police. Then these are the only ones that I'm aware of that are in the appellate court at this time. Thank you. I mean, in essence, these safe officers are out there doing what we normally see the sheriff or the state police or the municipal police doing, right? That's correct. They weren't assisting in some ongoing investigation. They were creating their own cases. That's correct. Other questions? Mr. Comey? Good afternoon. Thank you for allowing me an oral argument in this historic courthouse. I live north of I-80 and my primary practice oral argument is dead. And Gina DeVito, who you all know, wrote a great article for the Illinois Bar Journal about this case. And how we miss it so much up north. So I feel honored to be here today with you. Truly, I mean, you know, it's been years since I've been able to argue in one of these appellate courts. The Supreme Court is different, but here. But anyway, I'm here today defending Ms. Ringland as the appellee. And Ms. Ringland's case raises an issue of statutory construction and the construction of 55 ILCS 5-39005, which is the state's attorney's authority to act in the statutes beyond what's in the Constitution. Obviously, he's a constitutional officer in the judicial article and he's elected pursuant to that article. And then the legislature has set forth his duties. Section B of that statute says that the state's attorney of each county shall have the authority to appoint one or more special investigators. Then here are the key word, two. And that defines the next step, which is, is there to serve subpoenas, make return of process, and conduct investigations. And Justice Schmidt was raising the question about what investigations are conducted. Well, historically, that was the use of the grand jury. That was the use of the power of the grand jury to investigate matters. Potentially, the grand jury would appoint a special investigator, and the special investigator would go out and conduct an investigation regarding a matter that had already, the judicial process had started for it. The grand jury was in panel. The person was a target. It was already in progress. In the case of Bench, we have a person who becomes appointed, and the facts are clear. He was appointed in December. At that time, his fingerprints weren't taken. He signs an oath in January, around January 21st, and he makes the roadside stop on the 31st of January. And the statute was for the protection of the public here. This is not a statute that's designed to be merely directory, but this is to protect the public from having people running around with guns, potentially, who shouldn't have guns, and who have police powers in their possession. So what are we protecting the public from? Well, if you may recall, there is a case in the U.S. courts called Hampton v. Hanrahan. And if you may recall, the Hanrahan state's attorney's office raided the Black Panther's headquarters in Chicago, resulting in the deaths of some of the citizens of Illinois, which resulted in the appointment of a special prosecutor, and resulted in the disappointing as well as civil judgments entered against the state's attorney's employees, who were involved, and they had civil liability. That was the beginning of the opening of civil liability in the state's attorney's office. Prior to the Hampton raid, there was no liability for any of the actions of a county attorney in the United States. It was a watershed case in that regard, where all of a sudden they became personally liable for not only actual damages, but punitive damages for the wrongful death of somebody because it wasn't a judicial function they were exercising. The protection of the state's attorney comes about from the exercising of a judicial function, which has been helping the grand jury, assisting the grand jury in prosecuting the cases that are brought to his attention. So this statute was designed to protect the public. As was pointed out, this investigation was not an investigation, but really a traffic stop. There was no other state's attorney's office in Illinois which in any way, shape, or form operates a highway police. It's just not in Illinois. A highway police are a state's police. They're designated by statute. Within the traffic code, the state police are given the authority to operate on motor vehicles and make arrests and determine trucking violations, mudflap violations. And if you notice the testimony of Mr. Gaylor, in the course of his testimony, he even says it's only the state police that have the right to conduct the truck stops in the state and enforce the truck rules both nationally, which are the federal rules, as well as the state rules when it comes to operation of a truck. So Mr. Gaylor, by the 31st of January, has not had his fingerprints taken or sent to Springfield. He hasn't received a waiver from the board, which is required. And if we go further down in the statute, it says, no special investigator employed by the state's attorney's office shall have police powers or exercise police powers unless he successfully completes basic police training mandated and approved by the Illinois Law Enforcement Training Standards Board or such board waives the requirement by reason of special investigators prior to law enforcement experience or training. So that envisions before he can be out carrying a gun and conducting any stops on any highway or doing anything at all in a police capacity, he's got to have a waiver. And the waiver has to be delivered to the state's attorney's office. If there was any decision to be made about this statute and you had to look further into the statute, the next paragraph says, before a person is appointed, before the appointment takes place, as a special investigator, his fingerprints shall be taken and transmitted to the Department of State Police. So the appointment occurs, as we all know from the record here, the appointment goes down in December before Christmas. And so no fingerprints are taken. The appointment happens in violation of the statute itself, direct violation of the statute because the language is clear. I believe anybody who has a legal training and background would be able to understand the word before, meaning that it had to happen in advance of actually giving somebody the appointment. And if you have any question about what the General Assembly knew at this time, they certainly knew about Hanrahan versus Hampton because you would have had to have been in a graveyard in Illinois during that time frame not to know what was going on up in Chicago after the execution of those citizens. And the lawsuit that went on and played out in the news media for over three or four years went up to the appellate court, got reversed, went back down for trial. By the time it was over, it was 12 years' worth of litigation, well known to the legal community in Illinois. So this statute was designed to protect the public. And it even has other barriers in it to people being appointed. No person shall be appointed as a special investigator if he's been convicted of a felony or other offense involving moral turpitude. Well, as we know from this record and as my esteemed colleague has just pointed out, his fingerprints were taken in 1986 or 87. Imagine a law enforcement conference down in New Orleans where he visits the House of the Rising Sun, gets arrested for prostitution. People in Illinois might never know about that except for a fingerprints check. You're now talking about a very long period of time where things can happen. And we all know people aren't perfect and they do stupid things and they make mistakes. No fingerprint check of any kind is performed on this person. Nobody knows whether he's been arrested. This record is silent. Has he ever been arrested between 1986 or 87 when the prints were taken? Does he even qualify to be in the job? You can't say sitting here as a court that the evidence in the record shows that his qualifications are present. Now, I vehemently disagree with my esteemed colleague of the wisdom of trying to say that this is a directory statute. I believe it's a mandatory statute. I think it has to be read alone because it's specially designed for the state's attorney. It doesn't talk about other statutes other than having the powers of the appellate prosecutor's investigator. It doesn't say anything about part-time police officers. And the legislature full knows the entire compiled statute book in our state. I mean, in my lifetime, it went from one or two books to seven now. But they know what's in those statute books and they know if they want to include the part-time police officer statute, all they need to do is type in six words to say we want you to include this statute. But here, the General Assembly has not included that statute in any way, shape, or form. So although I think it's a brilliant attempt to try to save the situation here, it doesn't save the situation because it wasn't really discussed with Judge Ryan in any detail. It wasn't really argued. It wasn't really talked about. There was no attempt to focus on that in our particular record. Now, I do know that we have been consolidated. So I'm at a loss to know the records of the other case that I've been consolidated with because we were fully briefed by the time the consolidation took place and you have already heard the oral argument in that particular case. So if I'm trespassing on something from there, I apologize. I just don't know the records of those particular cases. But I can only imagine in the sense of judicial economy, Judge Ryan said, I heard that once. I don't need to hear it six times or whatever the number was and adopted some of those findings from our case. But our record is pristine in terms of you're able to decide this case on the fact that Judge Ryan was eminently correct in his decision. Nobody's coming in here and said they sent the fingerprints. Nobody's coming in here and said the fingerprints were sent before he was appointed. Nobody's coming here to tell you that there was a fingerprint check on him in any way, shape, or form. And he clearly possesses powers out on the interstate highway. Not those of the ordinary citizen. A car with lights, a siren, pullover equipment to pull people over on the highway. He clearly is not acting as a private citizen in this capacity. Now, Justice Schmidt, you asked about the question of warning books. In our appendix, there is some of the testimony of the state's attorney. The state's attorney was very clear that he himself did not hand them the warning books. But they're out there with warning books. Where in the Illinois statute does anyone envision the state's attorney handing out warnings for speeding? But in this case, what are we giving warnings for? In this case, it's the license plate. I'm holding up for the folks listening. Exhibit 6, defendant's exhibit, which is in the record below. She was purportedly stopped at one point. They started telling, well, they couldn't read the license plate. Judge Ryan took one look at this license plate and realized it was like every U-Haul truck in the United States. Because this is a standard truck. This is like you're going to Hertz or Avis, right? The license plate's on the back of the car. It's not obstructed. Everyone could see it. And Judge Ryan said, well, we can see that through the windshield from the dash cam. So that was one of the reasons, again, they're testified to as to why the stop. This was not a necessary stop for this reason. Then he goes on to talk about mudflaps. Who in the General Assembly is concerned about mudflaps in this statute? I mean, you can look at the public record of the General Assembly's conversations about this bill, and not one of them is talking about enforcing mudflap laws. The idea is to provide extra aid and assistance to the state's attorney so that witnesses get to court. So witnesses are in attendance in court. And, you know, the problem in Chicago is probably greater than it is in the smaller counties getting witnesses to court. But that was designed for that. The mudflaps were measured. They complied with the law. But nonetheless, the vehicle was stopped. And as long as you listen to the conversation and the transcripts, you're never going to find any discussion between Gaither and Ms. Ringwood where they're actually talking about, well, we pulled you over because of the mudflaps, and let's get out here and measure these mudflaps, and let's make sure before we write this ticket that you're right. They just say that's the reason for the stop. Well, so I guess my question is, let's just hypothetically have the order. If somebody agrees that there's substantial compliance with the fingerprint business, well, let's just assume the former trooper had been fingerprinted. Does this statute authorize this conduct? The state's attorney to create what is, in essence, another police department in Los Alamos County to go out and patrol the roads and make traffic stops. My research has not found any decision of any court that says a public officer has the right to create a police department. My understanding is that's the authority of the General Assembly. And that would be the case of the General Assembly or the county, if it were something to do with the county or maybe the municipality. But those powers are all derived from the municipal code or the county's code. So it'd have to come out of one of the, let's call them books for the moment, the county book, the municipal book, or the state book, right? It'd have to come out of one of the three books. Somebody would have to be given that authority to say, I'm empowering my own police department. But the worst evil that comes from this is that you no longer have any oversight. I mean, if you look at the situation in Oklahoma where that poor 73-year-old man mistook his taser and gun, there would be no oversight of that kind of situation because the state's attorney wouldn't be in a position to charge his own men. Well, and all that aside, let's just look at the statute. This is just what you think. These are obviously a creature of the choir here, but where in the statute is this authorized? Nowhere. Absolutely nowhere. But aren't they given the same power as the appellate prosecutor investigators that indicate if they follow, you know, they have the training or they get the waiver that they're peace officers and that they'll have all the powers possessed by policemen in cities and by sheriffs? I mean, it has a caveat, though. It says they can exercise those powers only after contact and in cooperation with the appropriate local law enforcement. It seems to give them some regular police power, but then it also seems to narrow that as having to be sort of, I guess, working alongside or under the, I don't know, the direction of the local law, which I know that you indicate that this was not a state trooper and an off-duty police officer that was riding along. This wasn't within his territory either. No. He was just out there being trained in the ways of picking cars off the interstate. But does this, does that power, I mean, does that extend them police power somehow? No, what you're focusing on is the historical. Illinois has always had a check on state officers when they come into a local county with the elected state's attorney. And if you look at the Attorney General's statute in conjunction with the statute governing state's attorneys, the state's attorney can invite the Attorney General in to assist and then he is responsible. In every case I was ever in like that, the state's attorney ran the grand jury, the person from Springfield was the assistant to the state's attorney, and the case ran as a partnership with both the state and the local. In this situation, you have no partnership with the state in any way, shape, or form. And that statute is designed to prevent the appellate prosecutor from Springfield running his own operation in Mount Vernon. I mean, that's, so I believe that's designed to be a protection to the locals that you can't have some state officer come running around in the jurisdiction where you have a popularly elected state's attorney in control of what happens in his own county. So I think that's what you're acknowledging by the nature of your question, the historical distrust of the Springfield person showing up and taking over in a county and not being popularly elected or having the support of the people. Does that answer your question? It does. I think what you're saying is that this statute does not allow them to have full police powers, only those that are given if they're invited into an investigation, if they're invited to assist with prosecution or investigation. I don't know. You look too young to have been here in 64. Well, you're correct, sir. The voters put the justices of the pieces out of business. And the reason the voters did that was they were tired of the guy getting money out of the prosecution because his salary was paid by successful convictions. They were fee officers. So if you look at our Constitution, in 64 the voters voted out these fee officers and that was followed in 70, in 1970, by a statewide referendum where the 70 Constitution gets adopted. So they carried forward the decision of the voters from 64. And you had courts like Calumet City where the justice of the piece got 50 bucks out of the speeding ticket. Well, if you authorize this, what you're doing is you're putting fee officers back in the business. When they seize cash out on the interstate, the state's attorney gets 10% of the action. So now he's not there policing the situation at an arm's distance like you want an attorney in a courtroom to represent the case and put it on. He actually has a financial outcome so it becomes contingent fee law enforcement. And so this is something that's an evil that the voters decided against in 64 and was reincorporated in the debates of the Constitutional Convention and went forward in 1970 to be the final Constitution we had. So, you know, there are a lot of evils that these statutes are designed to prevent because the people of Illinois have had a lot of history with evils that they don't want. And one of them was fee officers of any kind. You don't actually raise that issue. What's that? You don't actually raise the issue of the applicability of the statute itself. Well, I've raised all kinds of issues below. I filed a cross appeal. I don't know if you're aware I filed a cross appeal on this because we had the civil forfeiture case. No, I was not. Okay, so I filed a cross appeal. And my distinguished colleague, Ms. Kelly, was successful at convincing a panel of this court to dismiss my cross appeal because I wanted more of these issues in front of you because I thought it would be a more stimulating time and we might get more in 20 minutes so we could really enjoy being here like they did in the old days where they make sort of a day out of it and everyone has kind of fun and enjoy each other and, you know, be a good day. It's been fun. Well, you know, it's always nice when you see appellate judges smile, you know. Thank you so much. Thank you, Mr. Cohen. Ms. Kelly, for a moment. We progressed on the reply. Does anyone have any questions? I don't see any. You're awesome. Well, thank you both for your arguments here today.  and a written decision will be issued as soon as possible. And right now we'll take a brief recess for a panel.